UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CIVIL ACTION NO. 1:17-0462 (WOB)

SANDRA LYNN GENCO                                    PLAINTIFF

VS.                    MEMORANDUM OPINION AND ORDER

YWCA OF GREATER
CINCINNATI, INC.                                     DEFENDANT


This matter is before the Court on defendant's motion for
summary judgment (Doc. 38), which the Court previously took under
advisement (Doc. 47).

Having reviewed this matter further, the Court now issues the
following Memorandum Opinion and Order.

*Factual and Procedural Background*

Plaintiff Sandra Lynn Genco ("Genco") was born on June 6,
1955. (Genco Depo. Dc. 39-1 at #270). Genco began working for the
YWCA of Greater Cincinnati ("YWCA") in June 1998 as the Finance
Director. (*Id.* at #273). This title changed in name only to Vice
President of Finance in 2015. (*Id.* at #287-88). YWCA is a not-
for-profit social services organization aimed at eliminating
racism and empowering women. (Perez Aff., Doc. 38-2, #242, 243
¶9).

As Vice President of Finance, Genco was responsible for
monthly financial reports, drafting budgets, keeping and

protecting financial information, accounts payable, payroll, and training the employees she supervised. (Genco Dep. at #327); (Doc. 39-2, Genco Resume at #410).

Genco oversaw three employees in the YWCA Finance Department: Fateema El-Mansouri in payroll and grant billing; James Allison in accounting; and Rena Gibeau, the finance specialist. (Genco Dep. at #367-69). Fateema was hired in late June 2015, James in mid-August, and Rena in mid-December. (*Id.* at #328). By the time Rena became Finance Specialist in 2015, Genco still considered all three to be untrained. (*Id.* at #375:23); (Doc. 39-2, Ex. 15, #500). Genco testified that an employee was "untrained" if they still required Genco's help to complete their assigned duties. (Genco Dep. at #376:3).

As VP of Finance, Genco reported directly to the CEO of YWCA. Charlene Ventura ("Ventura") was CEO until 2015. In June 2015, Ventura retired and Barbara Perez ("Perez") became the CEO of YWCA. Perez had over 30 years' experience leading non-profit organizations. (Doc. 39-2, Perez Aff., #242).

Soon after she became CEO, Perez noticed that Genco missed deadlines and failed to meet "clear performance standards." (*Id.* at ¶11). One of the first major assignments Perez gave Genco was to ensure that YWCA's call counting software — called a "call counter" — remained functional. (Doc. 39-2, Exh. 7 and 8, Emails, #478-81). As its name suggests, the call counter keeps track of

all incoming calls, presumably regarding donations and other sources of funding. (Doc. 39-1, Genco Dep. #347-48). According to Perez, YWCA's funding relied on the continued operation of the call counter. (Doc. 39-2, Exh. 8 #478). In emails sent on September 30, 2015, Perez stated that she had been waiting for a solution to the call counter problem for "over a month" and that the situation was "unacceptable." (*Id.*) Another employee, Jennifer Sitler, expressed concern that further delay could jeopardize vital organizational information. (*Id.* at #479). Genco stated that she had been working on a solution to this problem. (*Id.* at #480). The phone system was eventually replaced sometime after October 4. (Doc. 39-1, Genco Dep. at #349).

On October 18, 2015, Genco was injured from a fall while out with her family at a restaurant. (Doc. 39-1, Genco Dep. at #480); (Doc. 39-2, Ex. 9: Email at #483). She required several stitches, was swollen on some areas of her face, and she broke her glasses. (Ex. 9: Email at #483). Genco stayed home to recover. (Doc. 39-2, Ex. 10: Email #484, 486). Through correspondence, Perez urged Genco to take the time she needed, to get rest, and to seek further medical attention if necessary. (*Id.* at #484-85). Perez told Genco that "James and the team" had current tasks under control, such as the budget and monthly financials. (Doc 39-2, Ex. 9 and 10 at #482, 485). Genco was later absent on November 10 to recover from headaches and cold chills. (Doc. 39-2, Ex. 11: Email, #487).

On November 30, 2015, Jessica Mays ("Mays"), a member of YWCA's Finance Board, requested a list of things that Genco did during the month and a procedural checklist of activities done during the "close process." (Doc. 39-2, Ex. 12: Email #488, at #491). Perez was copied on the email. (*Id.*) On December 7, Genco responded to Mays stating that the lists were not relevant to internal controls and that Genco would not have time to meet with Mays to go over the lists. (*Id.* at #489). Perez insisted that Genco give Mays the requested lists. (*Id.*) Perez stated that since Genco had known about this meeting for over a month but postponed the meeting twice, Genco's response to Mays was unacceptable and unprofessional. (*Id.*) In a lengthy email, Genco stated that she was overwhelmed by other deadlines and had done all that she could do. (*Id.* at 488). Genco then provided the lists to Mays when they met later that day. (Genco Dep. at #365:13).

The same day, Perez denied Genco's reimbursement request for Genco's weekend commute and part of Genco's cell phone bill. (Genco Dep. at #319:6-10). Perez did this by giving Genco a ripped-up reimbursement check. (*Id.*) Genco stated she was shocked by this. (Genco Dep. at #319:14). Perez stated that she simply did not want to encourage weekend work. (Doc. 39-2, Dunham Aff., Invest. Report #237, 241).

On December 11, 2015, Perez directed Genco to provide James with a system administrator password to permit James to work with IT staff. (Doc. 39-2, Ex. 13: Email at #492-93). Genco objected to the request, stating that this was not done in the past. (*Id.* at #493). She expressed concern about the integrity of the information in the network by giving James, a relatively recent hire, access to the system. (*Id.*); (Genco Dep. at #370:12-25). When Genco asked the VP of Human Resources, Martha Wolf, for her opinion about the password issue, Wolf told Genco that Genco may be "overthinking" the matter. (Ex.13: Email at #492).

On December 15, Perez asked Genco if she would be prepared for a Financial Board meeting to go over the October and November financials. (39-2, Ex.15: Emails, #499, 502). Genco stated that she was unable to finish either by the meeting time. (*Id.* at #501-02). Genco also asked to skip the October financial report and create an overview of October instead so that Finance could "catch up," stating this was acceptable "in the past." (*Id.* at #502). On December 16, Perez granted that request. (*Id.* at #501). In response, Genco stated that November financials would again take longer than anticipated. (*Id.* at #500). Genco cited recent staff shortages and an overwhelming workload as the reason for the delay. (*Id.* at #499).

By December 15, 2015, Rena Gibeau was hired as YWCA's Financial Specialist under Genco. (Genco Dep. at #375). Perez

asked Genco to make staff training a priority given that all Finance positions had been filled. (39-2, Ex.17: Email, #505). At that time, Fateema had been with YWCA for six months without full training. (*Id.*); (Genco Dep. at #379:16).

On December 15, 2015, Genco requested to take off several days at the end of the month. (Doc. 39-2, Ex. 16: Email, #503-04). Perez denied this request. (*Id.* at 503). Perez responded that Genco needed to correct a timesheet from November which did not reflect the use of vacation days for days Genco did not work. (*Id.*) Perez conditioned the rollover of Genco's accrued vacation days into 2016 on the correction of Genco's timesheet. (*Id.*) Genco was asked to work but was told that her unused vacation days could roll over into 2016.

On December 30, 2015, Genco sent Nancy Lawson, Board Chair, a complaint about Perez in the form of an extensive packet of various materials, apparently pursuant to YWCA's "Whistleblower Policy." (Doc. 39-2, Ex. 19, #538). These materials included, among other things, a lengthy chronological narrative criticizing Perez, a copy of YWCA's Whistleblower Policy, email correspondence between Genco and Perez, Genco's timesheets, and the shredded reimbursement check. (*Id.* at #523-37, 538, 564-91, 540-63, 593). The Whistleblower Policy is a mechanism by which YWCA employees report financial and managerial impropriety within the YWCA. (*Id.* at #538).

On January 12th, 2016, the Director of HR Solutions at Strategic HR Solutions, Inc., Patti Dunham, began an investigation into Genco's complaint packet. (Doc. 38-1, Invest. Report, #240). Dunham found that Genco's criticism essentially alleged a lack of internal controls, "harassment" by the CEO, and excessive, unmonitored spending by Perez. (*Id.*) Dunham's report stated that none of these complaints were valid. (*Id.*)

Specifically, Dunham found Genco's accusations against Perez for lack of internal controls and excessive spending not to be well founded. (Invest. Report at #240). She also concluded that James' administrative access to sensitive information was normal for such organizations. (*Id.*) Dunham also concluded that spending was also amply monitored and reported to the Financial Board. (*Id.*) She found that Perez's alleged harassment amounted to occasional displays of "curt," perhaps "unprofessional," behavior at most. (*Id.*) However, Dunham stated that Perez's demands that Genco meet deadlines and Perez's expressions of dissatisfaction with Genco's performance did not constitute harassment. (*Id.* at #240-41). Finally, Dunham concluded that Perez's denial of Genco's reimbursement did not single out Genco because James, who was younger than Genco, had been denied a similar request. This denial did not violate YWCA policy, which Genco later admitted. (*Id.* at #241)

Dunham concluded the investigation report by recommending that the YWCA continue to pursue Genco's termination, which Perez testified she had been considering since a few weeks after becoming CEO. (*Id.*) There was no mention by any party of age discrimination throughout the investigation. (*Id.*)

On January 22, 2016, Perez told Genco not to talk to her when Genco approached Perez in a faculty kitchen. (Doc. 39-2, Ex.23: Email at #627). Perez raised her hand dismissively and left. (*Id.*) Genco could not say, despite being offended by Perez, that Perez had raised her voice. (Genco Dep. at #406:7). Genco later sent Perez an apologetic email. (Ex.23: Email at #627). In that email, Genco stated that there would be further delay for the preliminary December financials, and she requested a fourth postponement of a Board meeting concerning internal review. (*Id.*) Perez responded that Genco had known about the meeting for several months and that if the tasks were not completed by the deadline that Perez would "take it from there." (*Id.* at #626). Genco forwarded this message to Lawson stating: "Sounds ominous and threatening." (*Id.*)

On February 15, 2016, Lawson and Perez terminated Genco'e employment during an official meeting. (Genco Dep. at #394:24-396:17). Genco testified that she heard Lawson state to her attorney at this meeting that Genco's termination had been officially pursued since December 30, 2015. (*Id* at #394:15-18).

Genco was replaced by Jessica Mays. (Doc. 39-2, Perez Inter. at #243 ¶17). Mays was formerly on the Board Finance Committee and was a former CPA with Deloitte & Touche. Mays was approximately 20 years younger than Genco. (Doc. 39-2, Ex.2: Genco Inter. # 412 ¶1).

Genco filed this lawsuit on August 5, 2016, originally in the Eastern District of Kentucky at Covington. (Doc. 1). The case was subsequently transferred to this Court pursuant to 28 U.S.C. § 1404(a). (Doc. 23).

Genco alleges claims for (1) intentional infliction of emotional distress; (2) wrongful termination; (3) age discrimination; and (4) fraudulent misrepresentation. (Doc. 1).

## Analysis[1]

### A. Intentional Infliction of Emotional Distress

To succeed on her claim of intentional infliction of emotional distress, Genco must prove:

(1)  that YWCA/Perez either intended to cause emotional distress or knew or should have known that their actions would result in serious emotional distress to Genco;

(2)  that YWCA/Perez's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community;

---

[1] The Court notes that plaintiff's memorandum in opposition to defendant's motion for summary judgment contains no citations to the record herein, but merely cites to her Complaint. (Doc. 43).

> (3) that YWCA/Perez's actions were the proximate cause of Genco's psychic injury; and
>
> (4) that the mental anguish suffered is serious and of a nature that no reasonable person could be expected to endure it.

*Ashcroft v. Mt. Sinai Medical Ctr.*, 588 N.E.2d 280, 284 (Ohio 1990).

**1. Perez did not have an intention, knowledge, or reason to believe that Genco would suffer serious emotional damage.**

Genco argues that being "forced" to work 1,500 hours overtime and postpone vacation, being "ridiculed" for not completing her assigned duties, and the "expectation that [Genco] work" after her accident collectively demonstrate an intent to cause serious emotional anguish. However, the record contains no evidence that Perez intended to cause Genco serious emotional trauma. Genco's allegation of intent, without more, is insufficient to raise a triable issue.

**2. Perez's behavior was not extreme of outrageous.**

The extremity element refers to extreme and outrageous conduct which a civilized society considers utterly intolerable and that causes serious psychic injury. *See Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of America*, 453 N.E.2d 666, 671 (1983) (quoting RESTATEMENT (SECOND) OF TORTS § 46 (1965)), *abrogated on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007).

This is a high standard to meet. *See Baab v. AMR Services Corp.*, 811 F. Supp. 1246, 1269. (N.D. Ohio 1993) ("[T]o say that Ohio courts narrowly define 'extreme and outrageous' conduct would be something of an understatement."). Even if based upon discrimination, an employee's termination does not rise to the level of "extreme and outrageous conduct." *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999) (applying Ohio law).

Genco's response characterizes Genco's relationship with Perez as one involving "forced" labor, humiliation, and harassment. However, the record contains no evidence that Genco was compelled against her will to work longer hours or to work while she was trying to recover from her accident. To the contrary, Perez had a policy against employees working on the weekends, and she stated multiple times that Genco should take the time she needed to heal.

The record is similarly devoid of evidence of harassment or intentional humiliation. As Patti Dunham, the HR Solutions investigator stated in her report, Perez's actions could be described as curt at times and at other times potentially "unprofessional." These include when Perez ordered Genco to complete a task for Jessica Mays with Mays copied in the email, Perez rolling her eyes at Genco's inability to operate a conference phone in front of other employees, and when Perez

dismissed Genco in the employee kitchen.  These actions fall far below the standard necessary for this tort.

### 3. Genco's sleeplessness and chest pains do not indicate that she experienced "serious" emotional distress.

In order to establish "serious" or "severe" emotional distress, a plaintiff must show that a "reasonable person, normally constituted, would be unable to cope adequately with the mental distress generated by the circumstances of the case.  *Godfredson*, 173 F.3d at 376 (citing *Reynolds v. Wingers, Inc.*, 621 N.E.2d 1239, 1243 (Ohio 1993)).

In *Godfredson*, the plaintiff complained of an upset stomach, loss of sleep, and financial concern.  *Id.*  The Sixth Circuit concluded that such symptoms do not rise to the level of seriousness or severity required under Ohio law.  *Id.* There must be more than mere hurt feelings, embarrassment, or anxiety concerning financial stability.  *See id.*

Here, Genco stated that she experienced sleeplessness, chest pains, and humiliation.  There is no medical or psychiatric testimony that verifies or quantifies the severity of these conditions.  There is no record evidence that Perez's actions toward Genco caused her chest pain and sleeplessness.  Still, even if these conditions are assumed to be both real and unpleasant, nothing in the record

demonstrates that Genco's conditions were unendurably
serious.

For all these reasons, defendant is entitled to summary
judgment on Genco's emotional distress claim.

**B.   Wrongful Termination**

That Genco was an at-will employee of YWCA is not in dispute.
That Ohio is an at-will employment state is not in dispute.  Both
parties thus had the right to end the employment relationship at
any time and for any reason.  *Wright v. Honda of Am. Mfg., Inc.*,
653 N.E.2d 381, 384 (Ohio 1995).  However, Genco claims that she
is protected by Ohio law from retaliatory termination under the
public policy exception to the at-will employment doctrine.

This claim fails for two reasons: (1) Genco failed to state
the public policy that her termination jeopardized, and (2) even
assuming that Genco is relying on Ohio's whistleblower statute,
Perez did not violate any law that Genco could have reported.

In *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308 (Ohio
1997), the Supreme Court of Ohio recognized a public policy
exception to the at-will employment doctrine.  The exception
requires these elements:

> (1)   that a clear public policy existed and was
>       manifested in the Ohio State or Federal
>       Constitution, statute, or administrative
>       regulation, or in the common law;
>
> (2)   that dismissing Genco would jeopardize the public
>       policy;

13

  (3) Genco's dismissal was motivated by conduct related
     to the public policy; and

  (4) YWCA lacked overriding legitimate business
     justification for the termination.

*Id.* at 321. Simply, an at-will employee-plaintiff may be protected

from termination if their termination jeopardizes a clear public

policy and there are no overriding legitimate reasons to justify

termination. *Id.* On summary judgment, the first two elements are

questions of law to be determined by the court, and the last two

elements are reserved for the trier-of-fact. *Id.* at 321 (citing

*Collins v. Riskana*, 652 N.E.2d 653, 658 (Ohio 1995)). To invoke

this statute, one must strictly comply with the dictates of R.C.

4113.52. *See Contreras v. Farro Corp.*, 652 N.E.2d 940, 944 (Ohio

1995).

  **1. Clear Public Policy**

  Genco has not stated a public policy that her termination

violates. Genco alleges that her treatment and termination by

YWCA were in retaliation for Genco's complaint to Nancy Lawson on

December 29, 2015. Genco sent the complaint packet to Lawson

pursuant to YWCA's whistleblower policy, but Genco must

demonstrate that she was reporting a clear violation of state or

federal law in that complaint. The record contains no evidence

that Genco was reporting any such violation. Construing the matter

liberally, it may be inferred that Genco is invoking Ohio's whistleblower statute.

The Ohio "whistleblower" statute states that if an employee becomes aware of a violation of public policy that the employer has the authority to correct, and the employee reasonably believes that the violation is an imminently dangerous criminal offense, a felony, or improper solicitation for contribution, the employee should notify the employee's supervisor of the violation. *See* R.C. 4113.52(A)(1)(a). Employers are prohibited from taking any disciplinary or retaliatory action against the employee for making such a report. *See* R.C. 4113.52(B)(1), *et seq.*

## 2. Jeopardization of Public Policy

After identifying a clear public policy, the plaintiff must state or demonstrate how that public policy was violated by their termination. Genco has not done this. There is no evidence that Perez committed any criminal offense, a felony, or improper solicitation for contribution. In her complaint to Lawson, Genco merely complained that Perez was disrespectful to her, that Perez didn't include Genco in certain decisions, and that Perez's judgment was flawed. Perez complained of no violation of law. Therefore, the Ohio whistle-blower statute cannot be grounds for Genco's common-law claim because there is no evidence that Genco was reporting any violations enumerated in R.C. 4113.52(A)(1)(a).

Genco's wrongful termination claim thus fails as a matter of law.[2]

## C.  Age Discrimination

Genco also has produced no evidence that she was discriminated against because of her age.

Genco did not file a complaint with the Equal Employment Opportunity Commission. The ADEA requires plaintiffs to exhaust such administrative remedies before seeking judicial remedies. Since Genco did not file a claim with the EEOC, the age discrimination claim is reviewed under Ohio law.

Under Ohio law, it is unlawful to discriminate against an individual in employment "because of . . . age." Ohio Rev. Code Ann. § 4112.02 (West 2017).  This Ohio code mirrors ADEA Section 623.  *See* 29 U.S.C.A. 623 (West); *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir.2009) ("Age discrimination claims brought under the Ohio statute are analyzed under the same standards as federal claims brought under the [ADEA].").  Ohio courts look to federal case law under the ADEA for guidance. *Clark v. City of Dublin*, Ohio, 178 F. App'x 522, 525 (6th Cir. 2006) (citing *Bucher v. Sibcy Cline, Inc.*, 738 N.E.2d 435, 442 (Ohio 2000)).

---

[2] Genco makes a brief assertion of promissory estoppel in her response to defendant's motion for summary judgment, but no such claim was raised in the complaint.  The Court thus will not consider that claim.

As here, where an age discrimination claim is supported by circumstantial evidence, the claim is analyzed under the *McDonnell Douglas* framework. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir.1998) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). A plaintiff must establish a prima facie case by demonstrating: (1) membership in a protected class; (2) adverse employment action; (3) the plaintiff was qualified for the position; and (4) replacement by a substantially younger employee. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 394 (6th Cir. 2008).

At the prima facie stage, a court should focus on a plaintiff's objective qualifications to determine whether he or she is qualified. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 575 (6th Cir. 2003). "[T]he inquiry should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills," rather than an employer's subjective expectations of an employee's performance. *Id.*

If the plaintiff is able to establish a prima facie case, the burden shifts to the defendant to state a legitimate, non-discriminatory reason for the adverse action. *Id.*

A plaintiff must then raise a triable issue as to whether the defendant's reason for her termination is pretextual by showing that the reason: (1) had no basis in fact; (2) did not actually

motivate the termination; or (3) was insufficient to warrant her dismissal. *Seger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012). In doing so, a plaintiff may demonstrate a dispute of fact as to pretext if she can demonstrate that she was significantly more qualified than their replacement. *Bender v. Hecht's Dept. Stores*, 455 F.3d 612, 627 (6th Cir. 2006). However, there must also be other evidence of discrimination besides a disparity in qualifications. *Id.* at 626.

Genco was over forty years old and was terminated. The Court further assumes that she was objectively qualified for her position. *See Wexler*, 317 F.3d at 575. She was also replaced by Mays, a substantially younger person. Genco has thus established a prima facie case.

Next, the defendant must state a legitimate, non-discriminatory reason for the adverse employment decision. Here, Defendant states that Genco was terminated because she repeatedly failed to meet deadlines, did not train her reports, appeared to stonewall and resist directives from Perez, and on multiple occasions went above Perez's head to complain to Ms. Lawson.

Thus, Genco must demonstrate that the YWCA's reasons are pretextual. Here, her age-discrimination claim fails. Genco acknowledges that she failed to fully train her reports and consistently failed to meet deadlines. While Genco offers various reasons why she failed to meet deadlines, the record simply

contains no evidence that Genco's termination was motivated by reasons other than those given by YWCA.

Genco has thus failed to carry the burden of demonstrating a triable issue of pretext.

### D. Fraudulent Misrepresentation

As the basis for her fraudulent misrepresentation claim, Genco alleges that Perez told Genco in mid-December 2015 to work instead of taking time off for the holiday, and she told Genco that she could use her vacation days at a later time.

In Ohio, common-law fraud requires the showing of six elements:

> (1) a representation or, where there is a duty to disclose, concealment of a fact;
> (2) which is material to the transaction at hand;
> (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred;
> (4) with the intent of misleading another into relying upon it;
> (5) justifiable reliance upon the representation or concealment; and
> (6) a resulting injury proximately caused by the reliance.

*Russ v. TRW, Inc.*, 570 N.E.2d 1076, 1083 (Ohio 1991).

Fraudulent misrepresentation can only concern facts of the present and past. *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 472–73 (Ohio 2018).

The parties dispute whether an alleged representation of Genco's future use of vacation days is a representation made

about a future fact. Relying on *Metz v. America Electric Power Company, Inc.*, 877 N.E.2d 316 (Ohio Ct. App. 2007), YWCA states that there was no fraudulent misrepresentation made, because even if there was a representation that Perez would honor Genco's roll-over vacation days in 2016, that representation concerned a future event.

In *Metz*, former executive employees of an energy trading company were told that the company was about to enjoy the second-best year the company had yet seen based on unsubstantiated information. The company did not do well that year and the employees received substantially less compensation than their employer represented they would. The court held that even this express statement about future benefits of employment failed to create an actionable claim of fraudulent misrepresentation because it amounted to a prediction of the future, at most. *Metz*, 877 N.E.2d at 329.

Genco argues that the alleged fraudulent misrepresentation pertained to a present state of facts because Perez had already resolved to terminate Genco when she "guaranteed" Perez would be able to use vacation days. However, considering the nature of at-will employment and an absence of any express promise of future employment, there was at no point a representation, true or false, that Genco would be employed in 2016.

Finally, the use of vacation days was part of a policy in the YWCA employee manual. As Genco concedes, all of the terms in the manual were subject to change by the YWCA at any time. There was no contractual obligation to honor or even approve the roll-over or use of vacation days.

For these reasons, Genco's fraudulent misrepresentation claim fails as a matter of law.

Therefore, having reviewed this matter, and the Court being advised,

**IT IS ORDERED** that defendant's motion for summary judgment (Doc. 38) be, and is hereby, **GRANTED**. A separate judgment shall enter concurrently herewith.

This 22nd day of August, 2018.



Signed By:

_William O. Bertelsman_ WOB

**United States District Judge**